IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GREGORY DUNCAN, *et al.*,               :

          Plaintiffs,               :          Civil Action 2:08-cv-180

   v.               :

BAINBRIDGE MANOR APTS., *et*               :          Magistrate Judge Abel
*al.*,
                                :
          Defendant
                                :

# Opinion and Order

Plaintiffs Gregory Duncan and Kelli Shackelford bring this action alleging that Defendants Bainbridge Manor Apartments ("Bainbridge"), a limited partnership which owned an apartment complex in Bainbridge, Ohio, and Landmark, the management company operating the complex, discriminated against them in refusing to allow Duncan to join as a co-tenant on Shackelford's lease because of his African American race and subjected them to a racially hostile housing environment. This matter is before the Court on the motion of Defendant Landmark Management, Inc. ("Landmark") for summary judgment (Doc. 35). [1]

Shackelford, a white former tenant at Bainbridge, and Duncan, her black boyfriend, allege that Defendant's agent, Bainbridge's site manager Cathy

---

[1] For simplicity, Landmark, the sole movant, is referred to herein as "Defendant".

McElwee, motivated by race discrimination, forced Shackelford out of her apartment and refused to permit Duncan to join her lease, in violation of provisions of the Civil Rights Act (42 U.S.C. §1982) and the Fair Housing Act (42 U.S.C. §3604).[2]  Their claims are, in short:

> Plaintiffs have claimed that 1) defendant refused to allow Gregory Duncan to be a co-tenant at Bainbridge Manor on account of his race; 2) defendant denied Kelli Shackelford the opportunity to live in an apartment with her African American boyfriend, 3) defendant's manager made statements indicating discrimination against black tenants, and 4) both plaintiffs were subjected to a racially hostile housing environment.

(Doc. 40 at 28.)

<u>Facts</u>.

On December 31, 2001, Plaintiff Kelli Shackelford and her two biracial children, then ages 5 and 7, moved into the Bainbridge Manor Apartments. Bainbridge offers subsidized low-income housing through a United States Department of Agriculture program called "Rural Development" (RD).  RD requires prospective tenants to provide certain information about income eligibility and background checks, and to re-certify annually.

---

[2] 42 U.S.C. §1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

42 U.S.C. §3604 makes it unlawful (a), to refuse to rent or to negotiate to rent "a dwelling to any person" due to race; (b) to discriminate against any person "in the terms, conditions, or privileges of sale or rental of a dwelling" due to race; and (c) "[t]o make, print, or publish, or cause to be made, printed or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race".

In the lease agreement, the tenant acknowledged that eligibility to rent the subsidized apartment depended on household income and that the tenant has the obligation to report changes in household income:

> (1)  I understand and agree that I will no longer be eligible for occupancy in this project if my income exceeds the maximum allowable adjusted gross income as defined periodically by Rural Development for the State of Ohio . . . .
> (2)  I agree to immediately notify the landlord of any permanent change in my gross income or adjustment to monthly income or a change in the number of persons living in the household. I understand that failure to report such changes may result in my losing benefits to which I may be entitled or may result in the landlord taking corrective action[3] if benefits were mistakenly received.

(Shackelford's January 1, 2002 Lease Agreement, pt. IV, Exh. 2, Defendant's October 14, 2009 motion for summary judgment, Doc. 35-2, at p. 2 of 11.)  The lease further provided that misrepresentation by the tenant of facts upon which eligibility determination was based would be investigated and reported in accordance with the requirements of the RD program.  *Id.,* Lease Agreement, pt. XIII.

For the period January 2002 through March 2007, each time Shackelford made a re-certification, she identified herself as head of household and listed her two children.  Gregory Duncan was not listed as a member of her household. (Defendant's Oct. 14, 2009 MSJ, Exhs. 3-5 and 7-14, Doc. 35-3 through 35-5 and 35-7 through 35-14.)  Shackelford understood that her rent was calculated based on the tenant's household income. (Shackelford Dep., at p. 64,  Defendant's Oct. 14, 2009

---

[3] Corrective action includes repayment of any rental assistance or subsidies improperly received and a higher monthly rent. *Id.*; Doc. 35-3.

3

MSJ, Exh. 40, Doc. 35-40, at p. 24 of 56.)

In February 2004, Shackelford began a romantic relationship with Gregory Duncan, who was her Children's Services caseworker.  Although he was not granted a divorce until December 2004, Duncan began to stay periodically at Shackelford's apartment.[4]  On September 13, 2005, Cathy McElwee,the apartment complex's new manager,[5] without first attempting to contact or speak with Shackelford or Duncan,[6] delivered a notice to Shackelford stating that she had violated Section IV of the lease.

On September 19, 2005, Duncan submitted an application to join onto Shackelford's lease.[7]  The application was extensive, and requested information about Duncan's income, assets, past and present residences, and personal references.  (Doc. 35-29 at 11-18.)   On September 21, 2005, an employee of Landmark sent McElwee an application status form requesting information as to where Duncan had lived since his December 2004 divorce, as well as custody information about Duncan's marital children.  It also indicated that if the

_____

[4]  Shackelford's March 26, 2007 housing discrimination complaint stated under penalty of perjury that Duncan had been staying with her for the past three years with the exception of every other weekend.  (Doc. 40-2 at 31.)

[5]  McElwee became the Bainbridge manager in August 2005. (Defendant's Answer, ¶ 7; Shackelford Aff., Doc. 40-1, ¶ 8; Duncan Aff., Doc. 40-3, ¶ 5.)

[6]  Shackelford Aff., ¶ 9; Duncan Aff., ¶¶ 5 and 12.

[7]  Plaintiffs maintain that Duncan made his first application to become a co-tenant on Shackeford's lease to McElwee's predecessor as apartment manager in June 2005. (Duncan Aff., ¶ 4; Shackelford Aff., ¶ 7.)

application were approved, they needed to check on his ownership of real estate. (*Id.* at 8.) That same day, Duncan provided a September 19, 2005 letter from the Social Security Administration stating that Gregory H. Duncan had applied for a Social Security card that he would receive within two weeks. Apparently attached to the letter was the Social Security number of "Gregory , M , Duncan."[8] (Doc. 35-29, at pp. 28-29.) On September 26, 2005, Duncan provided a copy of the Decree of Dissolution of his marriage. (Doc. 35-29, at pp. 22-24.)

On October 7, 2005, Landmark sent McElwee another status form, stating that the disposition of the real estate Duncan owned with his ex-wife was not in the divorce decree and asking whether Duncan still owned real estate after his divorce, and whether he currently lived at Bainbridge. (*Id.* at 7.) The September 19 rental application stated that his house at 432 Laurel Street, Chillicothe, Ohio went in a divorce to his ex-wife and children and that Duncan lived at Shackelford's apartment in Bainbridge Manor. (Doc. 35-29, at pp. 11 and 14.) On October 11, Duncan provided the divorce property settlement agreement. (Doc. 35-29, at pp. 25-27.) It provided that the ex-wife got title to the property, but included a provision that his ex-wife must sell or refinance the house within two years. Any proceeds would go to designated obligations. Any monies left over would go to Greg Duncan. *Id.* On October 13, Landmark sent another status form to McElwee, asking again

---

[8] A September 19, 2005 report from the Ross County Sheriff also included Duncan's Social Security number, as did a court record and a pay stub submitted to McElwee at the same time. (Doc. 35-29, at pp. 30-31 and 33.)

where Duncan had lived since his divorce and noting that his application listed a current address at Bainbridge itself.  On October 24, 2005, McElwee faxed the following to Landmark's Indiana corporate office:

> On Gregg Duncan yes I have met him.  He does stay with Kelli Shackelford some.  He is a very nice guy he does not cause any problems.  He does work at the VA Hospital.

(Doc. 35-29 at 21.)

On December 20, 2005, McElwee sent a form notice of rejection to Duncan at his mother's address in Chillicothe, stating that his application had been rejected for not finishing paperwork.[9]  (*Id.* at 3-4.)  At her deposition, McElwee stated that she had been told by her boss that rental applications had to be completed within sixty days.  (McElwee Dep., p. 60, Doc. 50-11 at 16.)  However, plaintiffs assert in their affidavits that they did not receive the December 20 notice; and in January 2006 McElwee told Shackelford that there was only one document that she needed from Duncan–a notarized affidavit that he had lived at his parents' house since his divorce.  (Shackelford Aff., ¶¶ 15 and 16; Duncan Aff., ¶ 7.)  Shackelford gave the document to McElwee that same day. *Id.*  On January 9, 2006, Duncan executed an affidavit stating that since his December 2004 divorce his address had been 135 Grand Ave., P.O. Box 1748, Chillicothe, Ohio 45601.  (Doc. 35-29, at p. 18.)  He also gave McElwee a writing on February 1, 2005 that stated he had lived at the Grand

---

[9] Although this document is in Bainbridge Manor's files, both Shackelford and Duncan maintain that they never received it. (Shackelford Aff., ¶ 15; Duncan Aff., ¶ 10).

6

Avenue address from December 22, 2004 to the present.  (Doc. 35-29, at p. 20.)

On January 11, 2006, Landmark sent McElwee another status form advising that "this application still does not make sense to me" and that "[f]or the time period of 12-04 to present I have no real address or reference to cover this time period".  (*Id.* at 5.)  According to Shackelford and Duncan, McElwee repeatedly asked Shackelford for more information concerning Duncan's application, and they promptly provided all the additional documents requested.  (Shackelford Aff., ¶ 13; Duncan Aff., ¶¶ 7-8).

Sometime in January or February 2006, McElwee informed Shackelford at a conversation in the laundry room that Duncan had been dropped from the waiting list.  According to Shackelford, McElwee wouldn't explain why Duncan was dropped from the waiting list.  (Shackelford Aff., ¶ 17.)  Shackelford informed Duncan of this conversation, and the two angrily confronted McElwee.  Duncan, upset, addressed McElwee with profanity.  (Duncan Dep., p. 11, Doc. 50-9 at 4.)  Shortly after Duncan and Shackelford returned home, a deputy sheriff arrived at Shackelford's apartment to speak with them about the encounter, though he left without filing charges.  On February 22, 2006, McElwee sent a second rejection of application notice to Duncan at a different address in Chillicothe, which stated as reasons for rejection "failure to finish paperwork & using profanity toward the manager".  (Doc. 35-39 at 1.)

After Duncan received this letter, Shackelford called Pat Spencer, Landmark's area manager, who advised Duncan to restart the application process.

7

She said that Landmark would waive the application fee.  (Spencer Dep., p. 102, Doc. 50-6 at 13.)  On February 28, 2006, Spencer sent a facsimile message to McElwee to forward to Shackelford, confirming this message and stating that the application would be dependent upon household income.  (Doc. 40-2 at 12.)  On April 4, 2006, McElwee sent another notice of lease violation to Shackelford, stating again that she had violated Section IV by "having people living in the household that are not on the lease & a change in income."  (Doc. 40-2 at 13.)  On April 25, 2006, Greg Harrison Duncan submitted a new application.  (Doc. 35-30 at 4-38).  On or about June 13, 2006, Landmark approved Duncan's application for further processing, though it noted areas on his application which were incomplete or for which it needed more information.  (*Id.* at 2.)  Neither Landmark nor McElwee ever informed Shackelford or Duncan that his application had been approved, although she did give her some additional paperwork for Duncan to fill out in June.  McElwee never contacted Shackelford to give her a date for Duncan to move in.  (Shackelford Aff., ¶¶ 24 and 25.)  On June 26, 2006, Duncan signed a declaration under penalty of perjury stating that he was unemployed.  (*Id.* at 16.)  However, on August 14, 2006, Shackelford wrote a note to Bainbridge Manor stating:  "I Kelli Shackelford does not want Greg Duncan added to my lease as a co-tenant."  (*Id.* at 1.)  Shackelford asserts that she wrote the note

> because I just couldn't handle the stress of going through the process anymore. I had hoped that if I let it drop, she would stop harassing me. I felt like there was no way she was ever going to let Greg be a co-tenant with me anyway because of the racist comments she had made . . .

(Shackelford Aff., ¶ 26.)

On October 4, 2006, McElwee gave Shackelford another notice of lease violation, stating that she had failed to pay her October rent.  (Doc. 35-22 at 1.)  The next day, McElwee gave Shackelford another notice of lease violation, stating that she had violated her lease by "allowing boyfriend to make recurring visits or one continuous visit of 14 days and or nights in a 45 day period without prior written notification to management."  (Doc. 35-23 at 1.)  The notice required Shackelford to correct the violation by October 15, 2006.  Shackelford asserts that after she got this lease violation notice she asked McElwee for the paperwork for Duncan to begin the lease application process again. McElwee refused, saying "he wouldn't qualify." (Shackelford Aff., ¶ 34.)  On October 30, 2006, McElwee gave Shackelford yet another lease violation notice, for "letting your children have BB & pellet guns on the property of the Bainbridge Manor."  (Doc. 35-20 at 1.)

On February 13, 2007, the Ross County Sheriff's Office responded to Bainbridge Manor.  The deputy's report stated that Mitchell Cade, another resident, claimed he had been outside his apartment when Duncan approached and threatened him.  The deputy spoke to Duncan, who claimed that he had seen Cade outside and had decided to speak to him about his conduct towards Shackelford's children.[10]  Duncan denied threatening him.  The deputy advised Cade and Duncan

_____

[10] Plaintiffs' memorandum contra was accompanied by an affidavit from Shackelford.  She stated that her biracial sons had been harassed and subjected to racial epithets by adults and other children living at Bainbridge, including fellow residents Mitchell Cade and Sonny Johnson, and that she had complained about

not to have contact with each other and left. (Doc. 35-34 at 1-3.) The same day, McElwee sent Shackelford another notice of lease violation, stating that she had violated her lease obligation to maintain the quiet enjoyment of the premises because her guest had threatened another tenant and provoked the involvement of law enforcement. (Doc. 35-25 at 1.) The notice advised her that if another such incident occurred within the next ten days she would receive a notice to vacate. On March 22, 2007, McElwee sent Shackelford another violation notice concerning Duncan's continued residence. (Doc. 35-26 at 1.)

On April 13, 2007, Shackelford and Duncan filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") against Bainbridge Manor and Landmark, claiming that they had been subjected to discriminatory terms and conditions of tenancy. (Doc. 35-37 at 11.) On April 2, 2007, McElwee sent Shackelford a notice to vacate. (Doc. 35-27 at 1-2.) It informed her that, because of her failure to "stop letting boyfriend stay with you even after you received a lease violation", she was ordered to vacate the premises by May 2, 2007. On April 3, 2007, McElwee had Mitchell Cade post notices on every tenant's door stating that Duncan had been barred from Bainbridge. (Doc. 50-13 at 6; Shackelford Aff., ¶¶ 42-43.) Later that day, deputy sheriffs again responded to Bainbridge after a telephone report that a barred individual was present at Shackelford's apartment. (Doc. 35-36 at 1-4.) According to the police report, the responding officer informed

this to McElwee. (Shackelford Aff., ¶¶ 27-28.)

10

Duncan that the manager had barred him from the unit and that he needed to leave.  After Duncan became belligerent and refused to leave, the officer activated and wielded his taser; Duncan thereupon submitted to arrest for criminal trespassing and was transported to the Ross County Jail.  Bainbridge never brought an eviction action against Shackelford; eventually, in July 2007, she moved to Tiffin Estates, a different apartment complex.  (Doc. 50-3 at 2.)  On August 2, 2007, the OCRC issued a determination that it was not probable that McElwee and Landmark had engaged in discriminatory practices.  (*Id.* at 3-4.)  On February 26, 2008, Shackelford and Duncan filed this lawsuit.

<u>Landmark's processing of Duncan's application to be a co-tenant</u>. The parties vigorously dispute how Duncan's application was handled. Plaintiffs maintain that they promptly provided all the information McElwee requested. Defendant argues both that plaintiffs do not understand the application process and that Duncan failed to timely provided information Landmark requested.

Although Defendant argues otherwise, there is a dispute of fact about whether Duncan timely provided all the documents McElwee requested. Contrary to Defendant's argument, McElwee is the lynchpin of the application process. There was no direct communication between Landmark's Indiana office and the tenant or prospective tenant. All communications from Landmark were to McElwee. Bainbridge's files do not document McElwee's communications with Duncan and Shackelford about missing information or documents. Essentially, it is McElwee's word against Duncan's and Shackelford's.

11

The evidence before the Court about the application process is as follows. The tenant or prospective tenant requested an application from McElwee. Once the application was filled out and delivered to McElwee, she would send it to Landmark's corporate office in Wabash, Indiana. At the time Duncan's applications were submitted, the next step was for Chris McClean to review the application for completeness. If it was incomplete, McClean contacted McElwee to request additional or missing information. Once the application was complete, McClean preliminarily approved or denied it.  (Carpenter Dep., pp. 13-16, Doc. 50-4; Spencer Dep., pp. 33-34 and 38, Doc. 50-5.) She then sent the application to Barbara Carpenter, corporate office manager, or Patricia Spencer, Landmark's area manager, for review. The types of things that could result in denying the application were negative landlord references, police reports, history of nonpayment, and history of evictions.  (Carpenter Dep., p. 16; Spencer Dep., p. 38-39.) If Carpenter or Spencer approved, McElwee was notified to proceed with the certification process. *Id.*  This paperwork included a certification checklist, household member form, tenant vehicle form, sources and verification of income, consent form, and forms required by the Ohio Housing Finance Agency to verify expenses such as childcare and medical. (Carpenter Dep., pp. 16-18; Spencer Dep., pp. 39-43.)  The information provided in these forms was then independently verified by Landmark contacting third parties. *Id.,* at 18. If complete, the certification was processed, and if not, the certification person followed up with the property manager. *Id.* Finally, since Bainbridge Manor is a tax credit property, the

12

certification had to be approved by Carpenter to insure compliance with applicable IRS formulas and other requirements (for example, confirming income limits, maximum rent that the household can pay, etc.).(Carpenter Dep., pp. 19-21.)

There is conflicting testimony about scheduling the move-in date. Carpenter testified that once the certification process was complete and approved, a form was mailed to the applicant to sign and arrangements were made between the property manager and the applicant to schedule a move-in.  (Carpenter Dep., pp. 21-23.)  The move-in date was not scheduled until "we get all the income verification." (Carpenter Dep., p. 23.) The move-in date would be a matter of days after income verification.  *Id.*  Linda DeLong approved Duncan's application.  (Carpenter Dep., p. 25.)  Although the paperwork for certification was in the file, Carpenter testified that certification was not made before McElwee got Shackelford's note that she did not want Duncan on her lease.[11]  (Carpenter Dep., pp. 26-28.)  However, she also testified that in June 2006 Duncan "was approved to move in, but his income was not certified; and so, therefore, he was not added to the lease."  (Carpenter Dep., p. 32.)  Carpenter seemed to indicate that she did not know why a move-in date had not been set.[12] (Carpenter Dep., p. 33.)

---

[11] Carpenter had no first hand knowledge of the Duncan application approval and certification process. She reviewed Landmark's files after the OCRC charge was filed to provide the Commission with an explanation of the actions Landmark took. (Carpenter Dep., p. 28.)

[12]Carpenter testified:
Q. And his -- Is that a correct way of saying Greg is not certified or would you say that his income was not certified? What language would

Patricia Spencer testified that the first notification to the tenant or prospective tenant that they are approved for move-in occurs when the application was initially approved and the tenant was asked to fill out the certification paperwork.  The tenant told the manager then when he or she wanted to move in. (Spencer Dep., pp. 47-48.)

Jackie Mittank was the Landmark employee who handled the certification process. (Carpenter Dep., p. 28.)  Mittank sent a letter to McElwee asking for Duncan's Social Security card.  Carpenter surmised that the request was made because Duncan listed his middle initial as "H" on one page of his financial certification form and "M" on another. (Carpenter Dep., pp. 27 and 30.)  This was

---

you use?
A. Well, he was approved to move in, but his income was not certified;
and so, therefore,
he was not added to the lease.
Q. Okay. When was he approved to move in?
A. I believe it was June of '06.
* * *
Q. June of '06 he was not certified other than -- he was approved to
move in but was not certified?
A. Correct.
Q. … Do you remember when the letter was sent out indicating that
Greg had to provide
a social security card?
A. No, I don't. It's in the file, but I don't.
Q. Was it before or after June of '06?
A. It would have been after that.
Q. Why had the move-in date been set then?
A. I didn't know -- A move-in date had not been set.
Q. No—A move-in date had not been set?
A. Not that I'm aware of, no.
(Carpenter Dep., p. 33.)

despite the fact that Duncan consistently wrote his name as Greg Duncan, Greg H.
Duncan, or Greg Harrison Duncan and had earlier provided birth records, Social
Security records, divorce papers, and employer verifications for Greg H. Duncan.

Once an applicant becomes a tenant, they are subject to annual
re-certifications which are reviewed and approved/denied by Carpenter. Reply Ex. 2
(Carpenter Dep.) Tr. 24. Duncan's 2006 application and certification were
processed by Linda DeLong and Chris McLean. Reply Ex. 2 (Carpenter Dep.) Tr.
25.

**Summary judgment**.

Summary judgment is appropriate "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue
as to any material fact and that the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there
are no genuine issues of material fact, which may be accomplished by
demonstrating that the nonmoving party lacks evidence to support an essential
element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart
v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid
summary judgment, the nonmovant "must do more than simply show that there is
some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8
F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about
a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury

15

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [...] but [...] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324. Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

**Section 1982 claim**.

Although Plaintiffs have brought suit primarily under the Fair Housing Act, 42 U.S.C. §3604, they also assert a claim under 42 U.S.C. §1982, which guarantees all persons "the same right... to inherit, purchase, lease, sell, hold, and convey real and personal property." Claims of rental discrimination under §3604 and deprivation of the right to rent under §1982 are of the same nature, but the statutes

16

do not provide identical protections.  In a similar case where a white plaintiff claimed that she was denied the opportunity to rent an apartment because of her black boyfriend, the Sixth Circuit Court of Appeals found that the analysis of §1982 claims (or closely related §1981 claims) is not congruent with that of claims of housing or employment discrimination.[13]  "Unlike Title VII, which makes the very act of discharge unlawful if it relates to a person's race, sections 1981 and 1982 merely ensure that all persons or citizens have 'the same right' to make contracts and lease property as white citizens."  *Campbell v. Robb*, 162 Fed.Appx. 460, 476 (6th Cir. 2006), citing *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1137 (9th Cir. 2000).

The *Campbell* court found it dispositive that the plaintiff was not qualified under the Section 8 rental assistance program to rent the apartment she sought:

> A person only has the "right" to enter into a contract or lease on the terms to which the parties have agreed.  Here, the plaintiff could not have entered into the transaction on the agreed-upon terms because the undisputed facts demonstrate that she was only able to rent the property with Section 8 assistance, and she was only qualified for Section 8 assistance with respect to a one-bedroom apartment while the Robbs' dwelling had three bedrooms.  Even if she had been qualified to rent a three-bedroom apartment, the level of Section 8 assistance she qualified for was insufficient to cover the agreed-upon rental amount.  Thus, even if we were to assume that Mr. Robb's discriminatory comments constitute direct evidence of discrimination, Campbell still fails to demonstrate that she suffered an injury cognizable under §§1981 or 1982 since she could not have been denied "the same right" to make a contract or enter into a lease when she was unable to meet the agreed-upon terms of the transaction.

---

[13] 42 U.S.C. §1981 protects the rights of all persons to make and enforce contracts or to participate in litigation.

*Id.* In the case at bar, Duncan sought to be added to Shackelford's lease.  His §1982 claim is founded upon not having been able to enter into that lease.  Defendant argues that the evidence is undisputed that Shackelford gave McElwee the August 14, 2006 note stating that "I Kelli Shackelford does not want Greg Duncan added to my lease as a co-tenant", (doc. 35-30 at 1); consequently, Defendant maintains, Duncan cannot prove that he was injured.   The parties, of course, characterize the circumstances differently; Shackelford stated at deposition that she gave McElwee the note because she was "fed up with her harassing me" and it "was just too much" to attempt to put Duncan on her lease.  (Doc. 50-2 at 13.)  McElwee, for her part, authenticated at deposition (Doc. 50-13 at 11) her record of a March 20, 2007 meeting recounting that Shackelford had asked that Duncan not be on her lease because he had gotten mad at her and kicked her.[14]  (Doc. 50-17 at 11.)

Assuming, as McElwee testified, that she could not have put Duncan on the lease after Shackelford gave her the note on August 14, 2006 (doc. 50-12 at 1), that fact alone does not demonstrate that Duncan suffered no injury. Plaintiffs maintain that Duncan first applied to be on the lease in June 2005 and again September 19, 2005 and that they promptly provided all the information requested of them.  If the jury finds that testimony credible, Duncan should have been placed on the lease in the Fall of 2005.  Similarly, Duncan again applied April 25, 2006 to be placed on the

---

[14]  Plaintiffs question (Doc. 40 at 10) the provenance and evidentiary value of the March 20, 2007 record.  In any case, there is no dispute as to the authenticity of Shackelford's note.  (Doc. 50-2 at 13.)

lease; and that application was approved June 13, 2006. Plaintiffs' evidence is that they provided all the information requested and they were never notified–as defendant's evidence suggests they should have been–that the application was approved. If plaintiffs' evidence is credited by the jury, then Duncan was wrongfully denied housing by Bainbridge sometime before August 14, 2006. Finally, if Shackelford's testimony is credited, she tried again to get Duncan on the lease in October 2006, but McElwee refused to process the application.

Since Duncan may be able to prove injury at trial, Defendant is not entitled to summary judgment on Plaintiffs' claims under 42 U.S.C. §1982.

### Housing discrimination.

To prevail on a Section 3604 claim, Plaintiffs must demonstrate either (1) disparate treatment (i.e. intentional discrimination) or (2) disparate impact (i.e. discriminatory effect.) *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996). Here, Plaintiffs plainly assert disparate treatment. To survive summary judgment on a disparate treatment claim, Plaintiffs must establish discriminatory intent either by presenting direct evidence of intentional discrimination by the Defendant or by showing the existence of circumstantial (that is, indirect) evidence which creates an inference of discrimination. *Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009); *see also Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995). Whether indirect evidence will create such an inference is evaluated through the familiar burden-shifting method of the

*McDonnell Douglas* test.[15]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*see Lindsay, supra*; *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523-24 (6th Cir. 2007)

(overruled on other grounds).  Conversely, direct evidence obviates the need to

determine whether an inference of discrimination can be drawn from circumstantial

evidence, because it is "evidence that proves the existence of a fact without

requiring inferences."  *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d

544, 548 (6th Cir. 2004).  The *McDonnell Douglas* test is inapplicable where the

plaintiff presents direct evidence of discrimination.  *Texas v. Crest Asset Mgmt.,*

*Inc.*, 85 F.Supp.2d 722, 729 (S.D. Tex. 2000), citing *Trans World Airlines, Inc. v.*

*Thurston*, 469 U.S. 111, 121 (1985).  A plaintiff brings direct evidence of housing

discrimination when he or she presents a "smoking gun" of discriminatory intent.

*Cavalieri-Conway v. L. Butterman & Assoc.*, 992 F.Supp. 995, 1003 (N.D. Ill. 1998),

*aff'd*, 172 F.3d 52 (7th Cir. 1999).

Here, Plaintiffs assert that they have presented direct evidence that

McElwee was deliberately trying to prevent any blacks from renting apartments at

Bainbridge.  Kevin Cowdrey, who identified himself as having lived at Bainbridge

at the same time as Shackelford, declared under penalty of perjury:

> 3.  When I was living there, I heard Cathy McElwee, the Manager at
> Bainbridge Manor, say that she didn't want any "niggers" living at
> Bainbridge Manor.  I also heard Cathy often use the word "niggers"
> when referring to black people when she was talking to women who

---

[15]  This framework, originally an analysis for employment discrimination
cases, has been adapted for fair housing claims.  *Selden v. United States Dep't of*
*Hous. and Urban Dev.*, 785 F.2d 152, 160 (6th Cir. 1986).

lived at Bainbridge Manor.

(Doc. 40-4 at 1.) Shawn Sexton, who identified himself as a maintenance man who worked at Bainbridge directly under McElwee and who said that he could hear conversations in her office, declared:

> 3. While working for Ms. McElwee, I often heard her refer to African-Americans as "niggers". On at least two occasions, I specifically heard her tell someone that "we're not going to have a bunch of niggers living here" and "I'm not going to have a nigger living here." I heard Ms. McElwee make the first comment soon after I began working at Bainbridge Manor Apartments. I am not sure who she was talking to or whether or not the comment referred to Mr. Duncan.
>
> 4. I heard Ms. McElwee say "I'm not going to have a nigger living here" right after Ms. Shackelford left McElwee's office after an argument about her lease. I believe that this argument took place shortly before Mr. Duncan was barred and Ms. McElwee had him arrested.

(Doc. 40-5 at 1-2.) Kevin Smith, who identified himself as having accompanied his friend Glenn Pendergraft when he went to apply for an apartment :

> 3. While Glenn was filling out papers in the manager's office, I heard a conversation between Cathy McElwee, the Manager at Bainbridge Manor, and a white girl, who came into the office to complain about a black guy who was coming to Kelli Shackelford's apartment. I knew that she was referring to Kelli's apartment because she described where the apartment was (two doors down from the manager's office, and I knew that Kelli lived in that apartment.) I heard Cathy talk with her for about 5-10 minutes and tell her that she didn't have to worry about it because there were not going to be any "niggers" living at Bainbridge Manor. After the girl left, Cathy McElwee told Glenn that she would get the girl out of the apartment that was two doors down from the manager's office and that there would be no "niggers" living there. I didn't say anything because I wanted Glenn to get the apartment.

(Doc. 40-6 at 1.)

21

Defendant has attacked this proposed direct evidence on two grounds.  One is that each account is improbable, contradictory to deposition testimony, or "as illogical as it is fabricated." (Doc. 35 at 12.)  Regardless of these challenges to the factual veracity and credibility of the statements, however, they are not impossible or patently false.[16]  Despite what Defendant has asserted as inconsistencies between these affidavits and deposition testimony, or bases for animus between the witnesses and McElwee, a reasonable jury could believe these three witnesses that McElwee was biased against blacks and that for this reason she had discriminated against the plaintiffs.  Moreover, on summary judgment the Court is charged with viewing evidence in a light most favorable to a nonmoving party.

The second is Defendant's argument that the Court should disregard these alleged comments under the "stray remarks" doctrine.  This doctrine, which originates from employment discrimination law, holds that discriminatory statements only constitute evidence of discrimination if they come from decisionmakers.  "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden... of demonstrating animus." *Geiger v. Tower Auto.*, 579 F.3d

---

[16]  Defendant has argued, unsuccessfully, that these declarations are inadmissible because they are not affidavits, but have not challenged them as hearsay. (*See* Doc. 51.)  In any case, the Sixth Circuit Court of Appeals has held in a similar situation that such statements are admissible, not to provide the truth of the statements, but to demonstrate the racial attitudes of the speaker. *Talley*, 61 F.3d at 1249-50 (6th Cir. 1995).  *See also Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1423 (7th Cir. 1986) (evidence of slurs uttered by supervisor not hearsay when offered in a Title VII action to show supervisor's racial attitudes).

614, 620-21 (6th Cir. 2009), quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998). *See also Lockett v. Marsh USA, Inc.*, 354 Fed.Appx. 984, 994 (6th Cir. 2009); *Wharton v. Gorman-Rupp Co.*, 309 Fed.Appx. 990, 995 (6th Cir. 2009); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244-45 (1989).  A court will, in evaluating stray remarks allegedly indicative of bias, consider whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the alleged discrimination.  *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994) (evaluating stray remarks in employment age discrimination context).

The nature of the direct evidence which Plaintiffs present makes it clear that, were the finder of fact to give it credence, there would be no question as to whether McElwee's alleged remarks were related to a desire to keep blacks out of Bainbridge.  Moreover, Sexton and Smith's allegations are that McElwee made such remarks directly in relation to Shackelford, her apartment, and the issue of whether Duncan would live there.  The only matter in real dispute is whether McElwee was a decisionmaker in the tenancy determination process such that it would make any difference what remarks she had made.

Defendant argues that Landmark's area manager and corporate officer manager testified that all tenant application decisions and processing are done at the corporate office in Indiana.  It characterizes the process of applying, and

23

becoming approved, for residency at Bainbridge as one largely performed by remote personnel evaluating and verifying the materials which property managers such as McElwee have forwarded on to them.  It has presented ample evidence that this process involves a considerable amount of communication between Landmark office personnel and McElwee, including requests for McElwee to obtain more information or documents to clarify Duncan's applications.  In short, Defendant argues, "there is no correlation" between McElwee's alleged remarks and "the processing of Duncan's application at the corporate office, the issuance of lease violations to Shackelford or any of the other complained-of conduct."  (Doc. 50 at 9.)

At trial, reasonable jurors might–or might not–conclude, as Defendant argues, that McElwee's authority to permit or deny Duncan to reside at Bainbridge was restricted.  However, Plaintiffs have sued not merely for the alleged refusal to permit Duncan to join Shackelford's lease, but for McElwee's alleged harassment of Shackelford for having a black boyfriend who came to visit her.  It is plain from the record that McElwee had the authority, and some discretion, to issue and resolve lease violation notices.[17]  She could, and evidently did, bar persons from visiting Bainbridge.  Whether or not she merely gathered information for applications and rented apartments to approved tenants, McElwee had decision-making authority

---

[17]  Landmark commented to the Ohio Civil Rights Commission that McElwee should have evicted Shackelford from her apartment sooner, and the OCRC found McElwee's failure to promptly do so demonstrative that she had no racial animus against Shackelford and Duncan.  (Doc. 35-37 at 3.)  This delay also, in any case, demonstrates that McElwee had some decision-making discretion as to whether, and when, to pursue efforts to evict residents for repeated lease violations.

with respect to how she operated Bainbridge itself.  A finder of fact could determine that, even if McElwee were actually powerless to determine whether Duncan's application to rent there would be approved, she could exercise her alleged racial bias in calling the police to remove Duncan from her apartment complex and in harassing Shackelford with repeated lease violation notices.  The Court finds, therefore, that if McElwee made the alleged remarks they were not vague, ambiguous, or unrelated to decisions as to rental applications or the treatment of existing tenants.

A plaintiff need present only direct evidence of racial discrimination to survive a summary judgment motion on the merits.  *Suits v. The Heil Co.*, 192 Fed.Appx. 399, 400-01 (6th Cir. 2006), citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348-49 (6th Cir. 1997).  This is the comparatively rare case where a plaintiff can actually present direct evidence of race discrimination.  Defendant vigorously disputes the accounts of Cowdrey, Sexton, and Smith, but whether their accounts of McElwee's alleged racial bias and determination to keep blacks out of Bainbridge are true is a genuine issue of material fact.  Despite the evidence Defendant has presented which it says demonstrates that Shackelford committed repeated lease violations leading to her eviction, that Duncan verbally abused McElwee and failed to timely complete his application paperwork, or that Duncan was treated fairly by Defendant's rental application process, the finder of fact could conclude that the plaintiffs' experiences were nevertheless the result of racial discrimination on the part of McElwee and Landmark.  The Court accordingly cannot grant Defendant

summary judgment on Plaintiffs' claims under §3604.

**Tenant harassment**.

Plaintiffs argue, as part of their claims, that Defendant is liable for failing to prevent or correct what they characterize as a "racially charged environment". They allege that harassment based on race was so pervasive from other tenants at Bainbridge that it interfered with their ability to enjoy the premises and eventually forced Shackelford to leave the complex.  Plaintiffs posit that tenants may bring actions under 42 U.S.C. §3604(b) for "causing and/or permitting" a racially charged hostile housing environment[18], and suggest that apartment complexes could become such environments in a manner analogous to workplaces becoming hostile work environments.

In making this claim Plaintiffs have aggregated alleged actions by Defendant's agent (serving Shackelford with violation notices, barring Duncan from the complex) with alleged actions by other tenants (use of racial epithets by neighbors), under the general concept of "condoning" racial harassment.  They argue:

> There is no reason why the well-established Federal precedent in employment should not apply to a landlord who is aware of the harassing conduct caused by tenants and yet does nothing to correct the harassment.  They have the same obligation to eliminate the problem as does an employer who can discipline and remove an

---

[18]Section 3604(b) provides that "it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

Case: 2:08-cv-00180-MRA Doc #: 69 Filed: 09/27/10 Page: 27 of 31  PAGEID #: 1459

> employee or non-employee or correctional officials who can discipline
> or remove the inmate from the environment.  The landlord has the
> right to control the tenant's tenancy, including evicting him/her.
> Defendant has admitted in its memorandum that it has evicted
> tenants for disturbing other tenants and for fighting.  There is no
> reason why defendant should not be required to discipline or evict
> tenants who are responsible for creating a racist environment.  As Ms.
> Shackelford states in her Affidavit, she continually informed Ms.
> McElwee about the racist comments made by other tenants.
> Defendant, however, refused to take any action against tenants who
> caused a racially harassing environment.

(Doc. 40 at 44, citations omitted.)  Defendant argues there is no reason why it

*should* be required to police its tenants. An employer is responsible for racial

harassment by his employees at his workplace because he pays to them to be there

and to take actions on his behalf.  Correctional officials  have the power to establish

rules and penalties for infractions such as racial harassment because they are

charged with maintaining the security of their penal institutions and the safety of

the inmates in their keeping.

Plaintiffs cite to *Williams v. Poretsky Mgmt., Inc.*, 955 F.Supp. 490 (D. Md.

1996), though they concede that this case involves sexually harassing conduct by an

*employee* of the landlord.  In *Reeves v. Carrollsburg Condominium Unit Owners

Ass'n*, 1997 WL 1877201 (D.D.C. 1997), the defendant was a condominium owners'

association which failed to take any action regarding the misconduct of one of its

owners against another.  The court in that case based its determination that the

defendant could be liable for failure to act on complaints of racial harassment on the

plaintiff's property interest in one of the condominium units, which included the

right to enjoy the protections of the association's bylaws against another member of

27

the association.  In *Neudecker v. Boisclair Corp.*, 351 F.3d 361 (8th Cir. 2003), the court found a colorable claim that the defendant landlord was liable for disability discrimination when, after tenants repeatedly harassed the plaintiff, the landlord responded to complaints with threats of reprisals for complaining.[19]  Finally, Plaintiffs cite to *Bradley v. Carydale Ents.*, 707 F.Supp. 217 (E.D. Va. 1989), in which a court found that a tenant had stated a claim under 42 U.S.C. §1982 in alleging that her apartment complex had failed to investigate and resolve complaints of racial harassment.

Neither this Court nor this circuit appears to definitively addressed the question.[20]  The Ohio Supreme Court recently addressed the issue, construing Ohio's parallel fair housing statute in *Ohio Civ. Rights Comm. v. Akron Metro*

---

[19]  The opinion in *Neudecker* seems to have been shaded by the allegations that the tenants harassing the plaintiff were two children of building managers, and that the building management had disclosed medical information about the plaintiff's disability to tenants.  *Id.* at 362-63, 365.  Moreover, in support for its conclusion that the landlord could be liable for the conduct of tenants, it cited only to *Crist v. Focus Homes, Inc.*, 122 F.3d 1107 (8th Cir. 1997) (residential home liable for failing to prevent misconduct by developmentally disabled resident) and *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982) (finding that a workplace environment could be rendered offensive even by the actions of non-employees).

[20]  In *Elliott v. Plaza Properties, Inc.*, 2010 WL 2541020 (S.D. Ohio June 18, 2010), this Court recently rejected a suit by a tenant who claimed, *inter alia*, that he had suffered racially motivated eviction, and supported this claim with allegations that a fellow tenant had overhead other tenants making discriminatory remarks.  The Court, citing *Neudecker, supra*, found that "[t]here is some scant authority for the proposition that, under some circumstances, a landlord can be held liable" for acts of tenants.  However, it found *Neudecker* unfollowed anywhere except in the Eighth Circuit, and instead cited with approval the Ohio Supreme Court's decision in *Akron Metro Housing Authority, infra*.  This analysis will follow suit.

*Hous. Auth.*, 119 Ohio St.3d 77 (2008). It rejected analogies to employer liability

such as the ones raised here by Plaintiffs:

> This liability of an employer for an employee's negligence derives from
> the established principles of agency law.  In *Burlington* [*Industries,*
> *Inc. v. Ellerth*, 524 U.S. 742 (1998)], the Supreme Court discussed
> employer liability for the tortious actions of an employee in the context
> of master-servant liability, noting that a master is not liable for the
> torts of a servant acting outside the scope of employment unless one of
> four factors exists.  None of those factors apply to the liability of a
> landlord for the actions of a tenant.  The agency principles that govern
> employer-employee liability have no parallel in the context of landlord-
> tenant disputes: "The relation of landlord and tenant in itself involves
> no idea of representation or of agency.  It is a relation existing between
> two independent contracting parties.  The landlord is not responsible
> to third persons for the torts of his tenant."  *Midland Oil Co. v.*
> *Thigpen* (C.A. 8, 1925), 4 F.2d 85, 91.[...]
>
> The amount of control that a landlord exercises over his tenant is not
> comparable to that which an employer exercises over his employee.  As
> the appellants observe, a landlord does enjoy a measure of control
> through his ability to evict tenants. [...] The power of eviction alone,
> however, is insufficient to hold a landlord liable for his tenant's
> tortious actions against another tenant.  We therefore reject the
> argument that our precedent in the employment context applies to the
> cause of action at issue here.

*Id.* at 81-82 (citations omitted).

However, the present case is readily distinguishable from *Ohio Civ. Rights*

*Comm. v. Akron Metro Housing Authority*. Here the jurors, if they credited

plaintiffs' evidence, could draw the inference from that evidence that McElwee

tolerated and helped to create or even encouraged a racially hostile environment.

Plaintiffs offer testimony that McElwee made racist statements in the presence of a

tenant and prospective tenants and that she consistently refused to address

Shackelford's complaints about other tenants' racist statements to her children.

29

The jurors could conclude from this that Defendant had denied Shackleford the right to quiet enjoyment of her leased apartment on the same terms as any other citizen, in violation of §1982.  *Bradley*, 707 F.Supp. at 223-24.

Even if Defendant's argument that a landlord cannot be expected to control the conduct of its tenants is accepted, it would violate the Fair Housing Act by employing an agent who tolerated and encouraged a racially hostile environment. It is not asking too much that a landlord adequately train its apartment complex managers in the requirements of the Fair Housing Act, that it let all its tenants know that it is committed to equal housing opportunities for all. Plaintiffs have submitted sufficient evidence to go forward on this claim.

### Constructive eviction.

Plaintiffs, in their complaint, allege that Bainbridge "constructively evicted" Shackleford from her apartment by continually harassing her, her children, and Duncan, and by giving her notice to vacate with a warning that if she did not move out she would be evicted.  (Doc. 2 at ¶13.)  The complaint alleges that these actions were violative of 42 U.S.C. §§1982 and 3604(a) and (b).  In its motion for summary judgment, Landmark states that Plaintiffs have failed to state a claim for constructive eviction under Ohio law.  Plaintiffs have made no response to this argument, and it does not appear from their complaint that they intended to bring such a claim under Ohio common law.

### Unclean hands.

Defendant also argues in somewhat imprecise terms that Plaintiffs' claims

are barred by the doctrine of unclean hands.  It asserts that Shackelford has not denied the reasons for which she was written up, that Duncan admitted under oath that he submitted fraudulent information in connection with an attempt to obtain public housing, and that Duncan's 2007 arrest was the result of his own actions. The doctrine of unclean hands requires that the plaintiff "must not be guilty of reprehensible conduct with respect to the subject-matter of his suit." *Kinner v. Lake Shore & M. S. Ry. Co.*, 69 Ohio St. 339, syllabus at 1 (1904).  "[I]t is fundamental that he who seeks equity must do equity, and that he must come into court with clean hands." *Christman v. Christman*, 171 Ohio St. 152, 154 (1960). This doctrine, however, is a defense to an action where the plaintiff seeks equitable relief.  *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, fn 5 (2007).  Here, Plaintiffs do not request any equitable relief.  Accordingly, the doctrine is inapplicable.

<u>Conclusions</u>.

For the foregoing reasons, the motion of Defendant Landmark Management, Inc. for summary judgment (Doc. 35) is **DENIED**.

The motions of Defendant for a hearing or status conference (Doc. 59), of Plaintiffs for leave to file a supplemental memorandum with additional caselaw (Doc. 62), and of Plaintiffs to rebut the arguments of Defendants' counsel during oral argument (Doc. 66) are **DENIED AS MOOT**.

s/Mark R. Abel
United States Magistrate Judge